IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LIFEBRITE LABORATORIES, LLC,

    Plaintiff,

      v.

NINA H. COOKSEY,

    Defendant.

CIVIL ACTION FILE
NO. 1:15-CV-4309-TWT

**OPINION AND ORDER**

This is a breach of contract action arising out of an employment relationship. It is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 41] and the Defendant's Motion for Partial Summary Judgment [Doc. 47]. For the reasons set forth below, the Plaintiff's Motion for Summary Judgment [Doc. 41] is GRANTED in part and DENIED in part, and the Defendant's Motion for Partial Summary Judgment [Doc. 47] is GRANTED in part and DENIED in part.

**I. Background**

The Plaintiff LifeBrite Laboratories, LLC ("LifeBrite") is a reference laboratory providing toxicology testing services to physicians and medical facilities, with its

principal place of business in Georgia.[1] The Defendant Cooksey is a resident of Tennessee.[2] Cooksey is an experienced sales representative in the medical testing industry who sells toxicology tests to medical practices and physicians on behalf of laboratory testing facilities.[3] This case arises out of the alleged breach of an employment contract that had been signed between the two parties.

While working for her previous employer, Cooksey had developed relationships with a number of physicians and medical facilities, including the three clients at issue in this case: Daniel Scott, III, MD ("Dr. Scott"), of Associates of Family Practice; Terry O. Harrison, MD ("Dr. Harrison"), of Paris Henry County Clinic; and Duane Williamson, MD, and Kathlene Hodges Williamson, FNP, of The Pain Clinic of Mississippi.[4] Partly as a result of her client relationships, LifeBrite recruited Cooksey in June 2015 for the position of "Business Consultant."[5] On June 23, 2015, LifeBrite emailed Cooksey an offer of employment ("Employment Offer") which she executed

---

[1]     See Def.'s Statement of Material Facts ¶ 1; see also Def.'s Notice of Removal ¶ 5.

[2]     Def.'s Statement of Material Facts ¶ 2.

[3]     Pl.'s Statement of Material Facts ¶ 5.

[4]     Def.'s Statement of Material Facts ¶ 5.

[5]     Id. at ¶ 12.

and returned via email the same day.[6] The Employment Offer contained an outline of Cooksey's employment with LifeBrite, but did not include a choice of law provision, a forum selection clause, nor any restrictive covenants.[7]

Not long after, the parties executed a second document entitled the "Employment Agreement,"[8] which was much more detailed than the Employment Offer. Among other things, the Employment Agreement stated that Cooksey would have no contractual authority,[9] and it provided for commissions of 8% of the "net profit" of the first 999 specimens she referred to LifeBrite, and 10% for every specimen after that.[10] The Employment Agreement also included a number of restrictive covenants. In particular, Sections 7.1.1-7.1.3. and Section 7.2 stated:

> **7.1.1. Clients.** For as long as she is employed and for a period of one (1) year thereafter, employee shall not initiate contact, directly or indirectly, with any person who is currently or has been a client of company in an attempt to induce or motivate them either to become a client of a competitive laboratory company.
>
> **7.1.2. Business Contracts.** For as long as she is employed and for a period of one (1) year thereafter, employee shall not initiate contact,

---

[6]   Id. at ¶ 19.

[7]   Id. at ¶ 21.

[8]   Id. at ¶ 23.

[9]   See Employment Agreement [Doc. 10-4], Section 6, at 4.

[10]   Id. at  Section 2.1, at 2.

directly or indirectly, with any person who regularly refers clients to company in an attempt to induce or motivate them either to discontinue such referrals or to refer clients to any other competitive laboratory company.

**7.1.3. Employees.** For as long as she is employed and for a period of one (1) year thereafter, employee shall not initiate contact, directly or indirectly, with any employees of company in an attempt to motivate or induce them to terminate their employment.

**7.2. Non-Competition.** For as long as she is employed and for a period of one (1) year thereafter, employee shall not participate, directly or indirectly, as an owner, employee, consultant, office management position, in any proprietorship, corporation, partnership, limited liability company or other entity, engaged in any laboratory testing that is being sold by employee on behalf of company.[11]

The Employment Agreement also contained a merger clause and Georgia choice of law provision. The parties signed and executed the agreement, and Cooksey began her employment with LifeBrite on July 6, 2015.[12]

Shortly after she began working at LifeBrite, Cooksey began to have complaints. For example, one of Cooksey's clients, Dr. Harrison of Paris Henry County Clinic, had expressed to Cooksey that the ability to use an electronic interface with LifeBrite was a high priority for him.[13] LifeBrite's CEO agreed to interface

---

[11]    Id., Sections 7.1.1-7.2, at 4-5.

[12]    Pl.'s Statement of Material Facts ¶ 31.

[13]    Def.'s Statement of Material Facts ¶ 39.

electronically,[14] but LifeBrite was unable to satisfactorily complete its electronic interface by the end of Cooksey's first two months of employment.[15] Fearing damage to her professional reputation, Cooksey began looking for other employment. She accepted an offer from another lab testing facility, MedLogic, on Wednesday, September 9, 2015.[16] She then sent her resignation letter to LifeBrite on Tuesday, September 15, 2015.[17]

During her employment, Cooksey managed to obtain three clients for LifeBrite: Associates of Family Practice,  Paris Henry County Clinic, and The Pain Clinic of Mississippi.[18]  Associates of Family Practice sent toxicology specimens to LifeBrite between July 31, 2015 and September 16, 2015, the day after Cooksey resigned.[19] On July 31, 2015, Associates of Family Practice referred 9 specimens to LifeBrite.[20] In August, 135 specimens were referred, and 66 specimens were referred between

---

[14]     Id. at ¶ 42.

[15]     Id. at ¶ 44.

[16]     Pl.'s Statement of Material Facts ¶ 34.

[17]     Def.'s Statement of Material Facts ¶ 46.

[18]     Pl.'s Statement of Material Facts ¶ 41.

[19]     Id. at ¶ 42.

[20]     Id. at ¶ 43.

September 1-16.[21]  Paris Henry County Clinic sent specimens to LifeBrite between August 4, 2015 and September 18, 2015.[22]  Paris Henry County Clinic sent 47 specimens in August, and 28 specimens in September.[23]  And The Pain Clinic of Mississippi sent specimens to LifeBrite between August 12, 2015 and October 21, 2015.[24]  During that time, The Pain Clinic of Mississippi sent to LifeBrite 87 specimens in August, 111 specimens in September, and 77 specimens in October.[25]

LifeBrite paid commissions for referred specimens on a monthly basis.[26] Cooksey received only one commission payment from LifeBrite, and that was only for a small number of the total specimens that had been referred to LifeBrite during her employment.[27] The one check Cooksey did receive was based upon an "average

---

[21]     Id. at ¶¶ 44-45.

[22]     Id. at ¶ 46. There is a slight discrepancy in the exact dates of when the specimens were sent, but the different accounts vary by only a few days. As a result, the difference is irrelevant here.

[23]     Id. at ¶¶ 47-48.

[24]     Id. at ¶ 49.

[25]     Id. at ¶¶ 50-52.

[26]     Id. at ¶ 53.

[27]     Def.'s Statement of Material Facts ¶¶ 47-48. Cooksey claims she was only paid for 26 of the 424 specimens she referred to LifeBrite. See Def.'s Resp. to Pl.'s Statement of Material Facts ¶ 54.

costs" calculation, in which LifeBrite reduced the gross revenue of referred specimens by 15%, LifeBrite's estimate of average fixed and variable costs.[28] In total, Cooksey was paid $836.02, which was 8% of the revenue received on 26 specimens after being reduced by 15%.[29]

After she resigned from LifeBrite, Cooksey visited each of her clients' offices and had discussions with her client contacts.[30] Cooksey and Dr. Scott maintain that she did not initiate the conversation in order to win the clients' business for her new employer; rather, she only went to notify them that she was leaving LifeBrite.[31] And at one point after her resignation, Cooksey held a conversation with Kristina Ivey, an employee at LifeBrite, in which they discussed The Pain Clinic of Mississippi account.[32] The parties disagree about the details of that conversation and what was discussed.[33] What is undisputed is that all three clients eventually stopped sending

---

[28]   Pl.'s Statement of Material Facts ¶ 57.

[29]   Id. at ¶ 60.

[30]   Id. at ¶ 73.

[31]   Def.'s Statement of Material Facts ¶ 77. See also Def.'s Mot. for Partial Summ. J., Ex. B at ¶ 4 (Dr. Scott stating that the Defendant "never solicited or induced business from myself or from AFP after her employment ended" with LifeBrite.).

[32]   See Pl.'s Statement of Material Facts ¶¶ 84-86; see also Cooksey Second Aff., p. 15 [Doc. 15-1].

[33]   Id.

their specimens to LifeBrite after Cooksey left, though only Associates of Family Practice ever started sending specimens to MedLogic.[34]

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[35] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[36] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact.[37] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[38] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."[39] Both parties have moved

---

[34]    Pl.'s Statement of Material Facts ¶ 78; Cooksey Depo. at 103-105.

[35]    FED. R. CIV. P. 56(a).

[36]    Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

[37]    Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[38]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

[39]    Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

for summary judgment on all of LifeBrite's claims, as well as Cooksey's Declaratory Judgment claim (Count 5). Only LifeBrite, however, has moved for summary judgment on the remainder of Cooksey's claims.

### III. Discussion

### A.   Cooksey's Declaratory Judgment Counterclaim (Count 5) and LifeBrite's Claim for Injunctive Relief (Claim 1)

#### 1.   Compensation Terms

In her claim for declaratory relief, Cooksey asks the Court to find that the entirety of the employment contract was void and unenforceable because it did not sufficiently define "net profit."[40] According to Cooksey, her understanding was that LifeBrite would only deduct the actual expenses associated with each individual specimen.[41] LifeBrite, on the other hand, deducted average expenses from each specimen's revenue.[42] The parties disagree further on the issue of calculating payment. Cooksey maintains that she is owed commissions for each individual specimen that she referred to LifeBrite, and that to this date she has only been paid on 26 of the 424

---

[40]   Pl.'s Mot. for Partial Summ. J., at 12-16.

[41]   Cooksey Third Aff., ¶ 10 [Doc. 47-5].

[42]   LifeBrite's Supp. Resp. to Cooksey's First Interog., at pp. 4-8 [Doc. 42-5].

specimens she referred during her employment.[43] LifeBrite claims that the parties never agreed for Cooksey to be paid on a per specimen basis. Rather, they agreed for Cooksey to be paid on the monthly net profits of her specimens, and that if she left before the payment period was over, she was not entitled to any payment for that month.[44] In other words, if Associates of Family Practice had sent 100 specimens to LifeBrite during the month of September, but had only paid for 20 of those specimens, Cooksey would be owed commissions only for those 20 specimens at the end of November. In LifeBrite's mind, Cooksey's commissions were based on amounts received rather than amounts billed.

"Employment contracts are enforceable under Georgia law only if they include '[t]he nature and character of the services to be performed, the place of employment[,] and the amount of compensation to be paid.' If any of these 'essential elements' are omitted, 'there is no agreement.'"[45] In the context of commissions, the employment agreement must state with definiteness the method of calculating the compensation.[46]

---

[43]    Def.'s Statement of Material Facts ¶ 47.

[44]    LifeBrite's Supp. Resp. to Cooksey's First Interog., at pp. 4-8 [Doc. 42-5].

[45]    H&R Block E. Enterprises, Inc. v. Morris, 606 F.3d 1285, 1294 (11th Cir. 2010) (quoting Farr v. Barnes Freight Lines, Inc., 97 Ga. App. 36 (1958)).

[46]    Id.

If the method of calculating commissions is sufficiently indefinite, the employment agreement is void and unenforceable.[47] However, "it is not necessary for a contract to state all details of the agreement..."[48] The policy of Georgia law is "against the destruction of contracts on the ground of uncertainty if it is possible in the light of the circumstances under which the contract was made to determine the reasonable intention of the parties."[49]

Cooksey argues that because the compensation provisions were so insufficiently defined that the parties had such markedly different understandings, the contract did not contain a compensation provision at all. The Court disagrees. Cooksey's mistake comes in assuming that ambiguous language necessarily means indefinite language. There is no question here that the language is ambiguous; that is, it is open to two reasonable meanings. The contract could easily mean either the net profit of each individual specimen or the net profit as calculated using average costs. Likewise, reasonable people could disagree about what the clause stating that Cooksey would be paid "in accordance with the normal payroll practices of the company" means in

---

[47]     Compare McLean v. Continental Wingate Co., 212 Ga. App. 356, 359 (1994) with Jackson v. Ford, 252 Ga. App. 304, 307 (2001).

[48]     Southeastern Underwriters v. AFLAC, 210 Ga. App. 444, 446 (1993).

[49]     Gram Corp. v. Wilkinson, 210 Ga. App. 680, 681 (1993).

conjunction with the contract language stating that she would receive commissions based on the specimens she referred.

But the question of enforceability is not whether contract language is ambiguous, it is whether it has an objectively ascertainable meaning. In <u>McLean</u>, like this case, the employment agreement did not specify a method for calculating net proceeds, but it was left up to the company in its sole discretion to choose a method.[50] Despite the ambiguity, the parties had a long relationship in which the company had consistently used a particular calculation method, evidence that the parties had agreed on the meaning of net proceeds.[51] The court found that the past dealings between the two parties made the terms of the contract definite enough to render it enforceable.[52]

By contrast, the contract in <u>Jackson</u> specified a variable contingency fee compensation scheme based upon "substantial work," the definition of which was in the sole discretion of the employer.[53] But if the employee did not perform "substantial work," then the employer had the discretion to pay him even less than the specified

---

[50]   <u>McLean</u>, 212 Ga. App. at 359.

[51]   <u>Id.</u>

[52]   <u>Id.</u>

[53]   <u>Jackson</u>, 252 Ga. App. at 304.

range.[54] The court found this to be "hardly definite," and thus, unenforceable.[55] The issue for the court was that there was no way to objectively ascertain the meaning of the compensation scheme. It was arbitrary and subjective.

The question the Court needs to determine, then, is whether the terms in this contract are definite enough that a jury could objectively find that the parties had reached mutual assent on a contract term. Once the Court finds that the terms in the contract are definite, then any ambiguity which still remains is given to the interpretation of the jury.[56] In this case, the parties agreed on an objectively ascertainable term. Though they disagree about the exact definition of "net profit," a jury could come to an objective conclusion about what the parties meant at the time. The term "net profit" is not meant to be subjective in the same way that the compensation scheme in Jackson was. Though the parties do not have the long history that the parties in McLean had, Cooksey did at least receive payment on one month's worth of commissions under the formula put forward by LifeBrite. And further, the parties clearly agreed that Cooksey would be paid for the commissions she referred to the company. While the language is not unambiguous enough for the Court to

---

[54]     Id. at 305.

[55]     Id. at 307.

[56]     Woody's Steaks, LLC v. Pastoria, 261 Ga. App. 815, 817 (2003).

decide the issue as a matter of law, there is enough definition in the contract terms for

a jury. The objective ascertainability of the contract terms, coupled with Georgia's

policy against the voiding of contracts, leads the Court to deny Cooksey's motion for

summary judgment on the issue of mutual assent to the compensation terms.

## 2.     Restrictive Covenants

Cooksey also seeks a declaratory judgment stating that the restrictive covenants

in the contract are unenforceable because they lack a geographic limitation. The

Employment Agreement contains both a non-competition clause and several non-

solicitation clauses, each of which are treated differently under Georgia law. Non-

competition clauses are generally enforceable as long as they are "reasonable in time,

geographic area, and scope of prohibited activities."[57] Non-solicitation agreements,

however, are not required to expressly state a geographic area or describe what

products or services qualify as competitive in order to be enforceable.[58] Rather, the

Georgia statute specifically tells courts that "[a]ny reference to a prohibition against

'soliciting or attempting to solicit business from customers' or similar language shall

---

[57]     O.C.G.A. § 13-8-53(a).

[58]     O.C.G.A. § 13-8-53(b).

-14-

be adequate for such purpose," and is to be narrowly construed so as to be enforceable.[59]

The non-solicitation clauses in the Employment Agreement[60] are written overly broad, but because the Georgia statute commands the courts to construe them narrowly, they are enforceable. The non-competition clause,[61] however, does not contain a geographic limitation. Under its terms, Cooksey would be prohibited from working for any potentially competitive company anywhere in the world. Such a result is clearly unreasonable under the statute, rendering the non-competition clause void and unenforceable.

Until 2011, the Court's analysis would have ended here. Under previous Georgia law, if any of the restrictive covenants were unenforceable, then they all were.[62] But in the Spring of 2011, the Georgia legislature passed a "blue-penciling" statute, giving courts the ability to "modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more

---

[59]    Id.

[60]    See Employment Agreement [Doc. 10-4], Sections 7.1.1 - 7.1.3, at 5.

[61]    Id. at Section 7.2.

[62]    See Lapolla Industries, Inc. v. Hess, 325 Ga.App. 256, 263 (2013) (analyzing an employment agreement that was entered into prior to the effective date of the 2011 statute).

restrictive with regard to the employee than as originally drafted by the parties."[63] The language of the statute is permissive rather than mandatory, meaning that it is within the Court's discretion whether to blue-pencil a contract. The new rule allows employment agreements to be saved even if one of their restrictive covenants is void. In this case, the Court chooses to exercise that authority under the statute, and holds the non-solicitation clauses contained in Sections 7.1.1. – 7.1.3. of the Employment Agreement to be enforceable.

The non-competition clause contained in Section 7.2. is a different story, however. The statute empowers courts to "modify" contracts. But the question in this case is whether "modify" means that courts may only excise offending language, or whether courts are empowered to actually reform and rewrite a contract. Clearly the former is permitted under the statute, but the latter is an issue of first impression in Georgia. Since the passage of the law, all of the state cases referencing it have dealt with contracts that were entered into before the statute took effect.[64] Only one federal court has actually exercised its new authority under the statute. In PointeNorth Ins.

---

[63]    O.C.G.A. § 13-8-53(d).

[64]    See, e.g., Early v. MiMedx Group, Inc., 330 Ga. App. 652, 657 n.9 (2015); Holland Ins. Grp., LLC v. Senior Life Ins. Co., 329 Ga. App. 834, 837 n.4 (2014); Murphree v. Yancey Bros. Co., 311 Ga. App. 744, 747 n.10 (2011).

<u>Group v. Zander</u>, No. 1:11-CV-3262-RWS, 2011 WL 4601028, at *1 (N.D. Ga. Sept. 30, 2011), the court granted a preliminary injunction that enforced an overbroad restrictive covenant. The covenant at issue barred the employee from soliciting both clients with whom the employee had contact as well as anyone who had been a client of the company within the last three months of the employee's employment.[65] Because it was easy to simply remove the offending language, the court never addressed the reform issue.[66]

This case, however, is not so easy. The non-competition clause is not just overbroad; it contains no territorial designation at all. In order for the clause to survive, the Court would need to rewrite it and supply a reasonable geographical limitation. The statute itself is of little help. It defines modification as including, "(A) Severing or removing that part of a restrictive covenant that would otherwise make the entire restrictive covenant unenforceable; and (B) Enforcing the provisions of a restrictive covenant to the extent that the provisions are reasonable."[67] While this

---

[65]    <u>Id.</u>

[66]    <u>Id.</u> at *3 (finding that "the Court may remedy that finding by blue penciling the provision to only apply to customers that the Defendant contacted and assisted with insurance.").

[67]    O.C.G.A. § 13-8-51(11).

language makes it clear that courts can remove offending language, it still provides little guidance on whether courts have the ability to insert language.

Other states which have similar language are split on the issue. Courts in Florida and Tennessee, for example, have construed the law to allow reformation and rewriting of contracts.[68] Some states have taken a middle road. Oklahoma courts, for instance, will modify a contract in situations as long as they do not need to supply "material terms."[69] Still other states, however, have taken the excising-only position on the blue-pencil rule.[70]

Generally speaking, Georgia courts took an even more stringent position when it came to employment contracts prior to 2011. One of only a significant minority of states, Georgia flatly refused to modify unreasonably restrictive covenants and would

---

[68]    See Estetique Inc. USA v. Xpamed LLC, No. 0:11-CIV-61740, 2011 WL 4102340, at *10 (S.D. Fla. Sept. 15, 2011) (reducing a five year time limit to a more "reasonable" time period of under two years); Money & Tax Help, Inc. v. Moody, 180 S.W.3d 561, 566 (Tenn. Ct. App. 2005) (applying a "rule of reasonableness" to supply a three year time limit on a restrictive covenant).

[69]    Howard v. Nitro-Lift Techs., L.L.C., 273 P.3d 20, 30, *cert. granted, judgment vacated on other grounds*, 133 S. Ct. 500 (2012).

[70]    See Dicen v. New Sesco, Inc., 839 N.E.2d 684, 689 (Ind. 2005) (declining to excise an overly broad geographical limitation because it would leave the clause with no limitation at all).

strike them down in their entirety.[71] This was in part because Georgia courts analyzed employment contracts with the strictest scrutiny due to the power imbalance between employers and employees.[72] Georgia courts viewed restrictive covenants in the sale-of-business context, however, with a much less searching review.[73] In those contracts, Georgia courts were allowed to blue-pencil unreasonable restrictive covenants, but that meant only the removal of offending language. In Hamrick v. Kelley, the Georgia Supreme Court held that a covenant in a sale-of-business contract which restricted competition within a seventy-five mile radius of the Metro Atlanta area was void because there was no clear definition of the Metro Atlanta area.[74] The court stated that "[t]he 'blue pencil' marks, but it does not write. It may limit an area, thus making it reasonable, but it may not rewrite a contract void for vagueness, making it definite by designating a new, clearly demarcated area."[75] In other words, the court could have

_____

[71]     See Alan Frank Pryor, Note, *Balancing the Scales: Reforming Georgia's Common Law in Evaluating Restrictive Covenants Ancillary to Employment Contracts*, 46 GA. L. REV. 1117, 1130 (2012).

[72]     See Malice v. Coloplast Corp., 278 Ga. App. 395, 400 (2006) ("most restrictive covenants in employment contracts are examined under strict scrutiny because they usually involve parties of uneven bargaining power.").

[73]     See Pryor, supra note 72, at 1126-27.

[74]     Hamrick v. Kelley, 260 Ga. 307, 308 (1990).

[75]     Id.

narrowed the clause to fifty miles from seventy-five, but it could not completely redefine the area.

The statute at issue here clearly indicated a change in policy from the stringent position on employment contracts that Georgia courts had previously taken. But the question is how much of a change in policy it entailed. Statutes in derogation of the common law are strictly construed in Georgia.[76] "The General Assembly properly can, of course, enact legislation that departs from the common law, but to the extent that statutory text can be as reasonably understood to conform to the common law as to depart from it, the courts usually presume that the legislature meant to adhere to the common law."[77] Nothing in the statute makes clear that the legislature meant to change Georgia's common law approach to blue-penciling other than to allow it in more circumstances. Further, the concern over the power imbalance between employers and employees in the employment contract is still present. Employers are sophisticated entities. They have the ability to research the law in order to write enforceable contracts; courts should not have to remake their contracts in order to correct their mistakes.

---

[76]    See Couch v. Red Roof Inns, Inc., 291 Ga. 359, 364 (2012).

[77]    Johnson v. Rogers, 297 Ga. 413, 416 (2015) (citation omitted).

For these reasons, the Court holds that the term "modify" used in O.C.G.A. §13-8-53(d) means the blue-pencil approach the Georgia Supreme Court took in <u>Hamrick</u>. Though courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth.[78] Therefore, the non-competition clause found in Section 7.2 of the Employment Agreement is void and unenforceable. Both parties' motions for summary judgment on Cooksey's declaratory judgment claim are granted in part and denied in part. Further, because the non-competition clause is unenforceable, the Plaintiff's claim for injunctive relief must also fail. The Plaintiff's motion for summary judgment on Count 1 of the Complaint is therefore denied, and the Defendant's cross-motion is granted.

---

[78]   The contract contains an "enforceability clause" which invites the Court to modify the contract in any way it sees fit to make it enforceable. This is nothing more than asking the Court to blue-pencil. If the contract had included a "step-down" provision, which provided an alternative geographic limitation, the Court could have done so. But it will not provide new terms wholesale that the parties have not agreed to.

**B.     LifeBrite's Breach of Contract Claim (Count 2)**

LifeBrite claims that Cooksey breached the Employment Agreement by working for another employer and soliciting LifeBrite's clients and employees after she left its employment. Both parties move for summary judgment on this count. As discussed above, the non-competition clause is void and unenforceable under Georgia law. Only the non-solicitation claims remain.

LifeBrite alleges that Cooksey violated Section 7.1.1. of the Employment Agreement when she visited the offices of Associates of Family Practice, Paris Henry County Clinic, and The Pain Clinic of Mississippi after she turned in her resignation to LifeBrite. The only evidence on the record about those conversations comes from affidavits by Cooksey that she did no more than to tell the clients that she was no longer going to be servicing their accounts and an affidavit by Dr. Scott of Associates of Family Practice confirming Cooksey's account.[79] Surely one does not solicit someone by merely having a conversation. Even mentioning that she was going to work for another lab cannot count as solicitation. To solicit is to use some sort of

---

[79]     Def.'s Statement of Material Facts ¶ 77. <u>See also</u> Def.'s Mot. for Partial Summ. J., Ex. B at ¶ 4 (Dr. Scott stating that the Defendant "never solicited or induced business from myself or from AFP after her employment ended" with LifeBrite.).

salesmanship, to encourage and persuade another to do something. Merely informing someone as to a change in circumstances does not qualify.

Despite this lack of evidence, LifeBrite maintains that a jury could infer that she solicited the clients based on the fact that they all ceased to be clients of LifeBrite shortly after Cooksey left. This argument would hold more weight if all three companies thereafter followed Cooksey to her new employer. But the record suggests that The Pain Clinic of Mississippi continued to send specimens until the end of October, when it apparently closed.[80] Paris Henry County Clinic did leave LifeBrite shortly after Cooksey, but it returned to its old lab, Millennium Health.[81] The only lab to do any business with Cooksey's new employer after she left LifeBrite was Associates of Family Practice, [82] and the only evidence of that conversation suggests that Cooksey did not solicit it in any way. Dr. Scott confirms this version of the conversation.[83] Given the complete lack of evidence to the contrary, LifeBrite's claim that Cooksey solicited its former clients must fail.

---

[80]      See Cooksey Depo. at 108-109 [Doc. 42-2]; Pl.'s Amended Mot. for Summ. J., at 125 [Doc. 43-1].

[81]      Harrison Depo. at 25-39 [Doc. 53-1].

[82]      Cooksey Depo. at 103-105.

[83]      Scott Aff. at ¶¶ 4-5 [Doc. 47-4].

LifeBrite also claims that Cooksey solicited its employee, Kristina Ivey, in an attempt to convince her to come and work for MedLogic, thereby breaching Section 7.1.3. of the Employment Agreement. In support of its argument, LifeBrite cites an email from Ivey detailing a conversation she reportedly had with Cooksey.[84] However, the email suffers from a number of evidentiary problems, most of all that it constitutes hearsay. Since there is no admissible evidence to support LifeBrite's argument, its claim based on Section 7.1.3. must also fail. For the reasons above, the Plaintiff's motion for summary judgment on its breach of contract claim is denied, and the Defendant's cross-motion for summary judgment is granted.

**C.     LifeBrite's Tortious Interference Claims (Counts 3 & 4)**

LifeBrite claims that Cooksey intentionally interfered with LifeBrite's contractual and business relationships with Associates of Family Practice, Paris Henry County Clinic, and The Pain Clinic of Mississippi. Both parties have moved for summary judgment on these two claims. Both claims require a showing of the same elements, namely:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to

---

[84]     Fletcher Aff., Ex. 4.

enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.[85]

At the outset, LifeBrite's contract based tort claim must fail. There is no evidence on the record that any of the three clients had contracts with LifeBrite for Cooksey to have interfered with.

But LifeBrite also fails to prove its business relations claim as well. To succeed, LifeBrite needs to prove that Cooksey took some improper action or wrongful act. LifeBrite claims that Cooksey interfered with its business relationships when she allegedly convinced them to stop sending their business to LifeBrite. Even assuming that Cooksey did such a thing, the type of improper conduct that the law has in mind is something more than simple persuasion. "[I]mproper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions."[86] Having a conversation with someone for the purpose of trying to win his business is not in the same category.

---

[85]  <u>Kirkland v. Tamplin</u>, 285 Ga. App. 241, 243 (2007).

[86]  <u>Id.</u> at 244.

Now, it is true that actions taken with the sole purpose of harming another party can be malicious enough to constitute a wrongful act.[87] But once again the crux of LifeBrite's problem is that it has absolutely no evidence that Cooksey told the clients anything more than that she was leaving LifeBrite, let alone try to persuade them to come with her. LifeBrite tries to argue for the opposite by inference from the fact that all three clients eventually stopped using LifeBrite's services. But as the Court discussed above, the facts do not support this inference. Moreover, "[g]uesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment."[88] Viewed even in its best light, LifeBrite's argument is nothing more than mere speculation. For these reasons, the Plaintiff's and Defendant's motions for summary judgment as to the Plaintiff's tortious interference claims are respectively denied and granted.

---

[87]    Architectural Mfg. Co. of Am. v. Airotec, Inc., 119 Ga. App. 245, 249 (1969) ("Merely to persuade a person to break his contract, may not be wrongful in law or fact. But if the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefitting the defendant, at the expense of the plaintiff, it is a malicious act, and a wrongful act, and an actionable act if injury ensues from it.") (citations omitted).

[88]    Rowell v. Phoebe Putney Mem'l Hosp., Inc., 338 Ga. App. 603, 605 (2016).

**D.     LifeBrite's Unfaithful Agent Claim (Count 5)**

LifeBrite claims that Cooksey was an unfaithful agent and that she breached her fiduciary duty by taking employment with MedLogic while she was still employed by LifeBrite between September 9 through September 15, 2015. Generally speaking, "an employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed. Even before the termination of his agency, he is entitled to make arrangements to compete ... and upon termination of employment immediately compete."[89] In Nilan's Alley, the court held that a salesman did not breach his duty of loyalty when he explored a client's interest in following the salesman if he left his employer.[90] The court found that he had been merely preparing to compete with his employer, as no actual agreement was struck between the salesman and the client until after the salesman had terminated his employment.[91]

In this case, there is no evidence that Cooksey even had that level of conversations with the three clients. Nor is there evidence that Cooksey actually began to work at MedLogic until she had tendered her resignation. Accepting employment

---

[89]     Nilan's Alley, Inc. v. Ginsburg, 208 Ga. App. 145 (1993) (citations omitted).

[90]     Id.

[91]     Id.

with a competitor is mere preparation; competition does not begin until one actively begins to solicit business. Moreover, Cooksey did not have any conversations with the clients until after she tendered her resignation. As a result, there is nothing to support the claim that Cooksey breached any fiduciary duty to LifeBrite. The Plaintiff's motion for summary judgment on its unfaithful agent claim is denied, and the Defendant's cross-motion is granted.

### E.   Cooksey's Breach of Contract Counter-Claim (Count 1)

Cooksey counter-claims that LifeBrite breached the Employment Agreement by failing to pay her commissions on all four-hundred-plus specimens which were sent to LifeBrite by Cooksey's clients. Only LifeBrite seeks summary judgment on this count. It is undisputed that LifeBrite has only paid Cooksey commissions on twenty-six specimens so far. What is in dispute is whether Cooksey is owed commissions on the remainder and whether she was paid commissions under the correct formula.

LifeBrite first claims that when Cooksey cashed the one check she did receive, it counted as an accord and satisfaction of the debt. But LifeBrite's reliance on Mobley v. Fulton Roofing Co., 173 Ga. App. 563 (1985) is inapposite here. As the Mobley court says, in order for there to be an accord and satisfaction, there must be an understanding, either express or implied, that this constitutes a complete payment.

"An accord and satisfaction is itself a contract which requires a meeting of the minds in order to render it valid and binding."[92]

It is true that "[i]t is not necessary that a check or the accompanying correspondence contain magic words such as 'payment in full,' 'in full consideration,' or 'in final payment' if there is some other documentary evidence to show what the check is intended to cover."[93] But there is no evidence on the record to suggest that Cooksey had an understanding of the methods calculated. Though LifeBrite cites to her pay stubs, nothing in the stubs breaks down her commission structure.[94] And though they cite to an itemization of the structure, nothing in the record suggests that the itemization was ever provided to her.[95] Nor did LifeBrite and Cooksey have the long relationship of the parties in Mobley. Cooksey had only received one commission payment from LifeBrite, as opposed to the three years of commission payments the employee in Mobley had received.[96] When the movant has failed to

---

[92]     Mobley, 173 Ga. App. at 564 (citations omitted).

[93]     Id.

[94]     See [Doc. 42-4] at pp. 114-118.

[95]     Id. at p. 119.

[96]     Id. at pp. 114-118.

show that there is no genuine issue of material fact, as LifeBrite has failed to do here, the existence of an accord and satisfaction is a question for the jury.

Ultimately, the dispute comes down to an interpretation of the contract. On the one hand, Section 2.1 of the Employment Agreement reads that Cooksey "shall be payable in accordance with the normal payroll practices of the company."[97] But on the other hand, the Agreement also states that she is to be paid commissions on the "net profit" of "specimens referred."[98] As the Court discussed above, there are genuine ambiguities as to the meaning of these terms. Does net profit entail an average cost applied or the actual cost of each specimen? Is a specimen "referred" when the final bill has been paid, or when Cooksey has completed her portion of the transaction? And how does the "normal payroll practices" clause affect those two questions? All of these are issues for a jury. As a result, LifeBrite's motion for summary judgment on Cooksey's breach of contract claim is denied.

---

[97]     Employment Agreement [Doc. 10-4], Section 2.1.

[98]     Id.

### F.   Cooksey's Equitable Counter-Claims (Counts 2 & 4)

Cooksey has also filed equitable claims for promissory estoppel and unjust enrichment, on which LifeBrite moves for summary judgment. LifeBrite argues that these claims are inappropriate because there is a written contract on the same subject. However, Georgia law "permits a plaintiff to proceed to trial on alternative theories of recovery."[99] Though the equitable claims may become moot if the jury finds that LifeBrite was liable under the Employment Agreement, if the jury finds the opposite LifeBrite may still be liable under the equitable theories. As a result, the Plaintiff's motion for summary judgment on Cooksey's equitable claims is denied.

### G.   Both Parties' Claims for Attorneys' Fees

Both parties claim attorneys' fees under O.C.G.A. § 13-6-11, and both parties move for summary judgment on the other's claim. "A prerequisite to any award of attorney fees under O.C.G.A. § 13–6–11 is the award of damages or other relief on the underlying claim."[100] Because all of LifeBrite's substantive claims have failed, Cooksey is entitled to summary judgment on LifeBrite's claim for attorneys' fees. On the other side, there has been no showing thus far that LifeBrite has acted in bad faith,

---

[99]   Wingate Land & Dev., LLC v. Robert C. Walker, Inc., 252 Ga. App. 818, 821 (2001).

[100]   United Companies Lending Corp. v. Peacock, 267 Ga. 145, 147 (1996).

been stubbornly litigious, or has caused Cooksey unnecessary trouble and expense. However, it would be premature to grant summary judgment on Cooksey's claim for attorneys' fees because the litigation is not over yet. LifeBrite's and Cooksey's motions for summary judgment on the claims for attorneys' fees are therefore denied and granted, respectively.

## IV. Conclusion

For the foregoing reasons, the Plaintiff LifeBrite's Motion for Summary Judgment [Doc. 41] is GRANTED in part and DENIED in part. The Defendant Cooksey's Motion for Partial Summary Judgment [Doc. 47] is GRANTED in part and DENIED in part.

SO ORDERED, this 9 day of December, 2016.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge